**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| APOTEX INC. )<br>150 Signet Drive )<br>Weston, Ontario, Canada M9L 1T9, )<br> )<br>Plaintiff, )<br>v. )<br> )<br>FOOD AND DRUG ADMINISTRATION )<br>5600 Fishers Lane )<br>Rockville, Maryland 20857, )<br> )<br>TOMMY G. THOMPSON )<br>Secretary of Health and Human Services )<br>200 Independence Avenue, S.W. )<br>Washington, D.C. 20204, and )<br> )<br>LESTER M. CRAWFORD )<br>Acting Commissioner of Food and Drugs )<br>5600 Fishers Lane )<br>Rockville, Maryland 20857, )<br> )<br>Defendants. )<br>_____) | Case No. |

**COMPLAINT**

The plaintiff, Apotex Inc. ("Apotex"), for its complaint against the Food and Drug

Administration ("FDA"); Tommy G. Thompson, Secretary of Health and Human Services; and

Lester Crawford, Acting Commissioner of FDA, alleges as follows:

**Nature Of The Action**

1.      Apotex brings this action for declaratory and injunctive relief challenging FDA's

February 6, 2004 decision refusing to grant final approval of Apotex's Abbreviated New Drug

Application ("ANDA") No. 75-360 for generic gabapentin capsules under the drug approval

provisions of the Federal Food, Drug, and Cosmetic Act (the "FDCA").  FDA's decision violates

the FDCA and the Administrative Procedure Act ("APA") because Apotex has satisfied all

substantive requirements for final approval, and there are no unexpired exclusivity periods delaying such approval.

2.     Apotex is one of several generic drug companies that has filed an ANDA for generic gabapentin capsules, currently marketed solely by Warner-Lambert Co. (now Pfizer Inc.) under the brand-name Neurontin®.  With the exception of Apotex's competitor, Purepac Pharmaceutical Co. ("Purepac"), FDA has refused to approve any other gabapentin applicant, including Apotex, on the ground that Purepac is purportedly entitled to a *second* period of so-called "180-day exclusivity," during which time no other gabapentin ANDAs may be approved.

3.     FDA's decision is arbitrary, capricious, and contrary to law, and has indefinitely delayed the public's access to lower-priced generic gabapentin.  Under the only proper interpretation of the FDCA, there can be only *one* 180-day exclusivity period per drug product.  On January 2, 2004, in a case involving another drug, Judge Richard W. Roberts of this Court explicitly endorsed and applied this interpretation of the FDCA.

4.     As properly applied here, there can be no more exclusivity periods for gabapentin ANDAs.  The only exclusivity period for gabapentin capsules, if any, has long since expired, thus opening the gabapentin market to Apotex and any other approvable applicants.  In a final decision letter issued February 6, 2004 (the "Letter Ruling"), however, FDA has unlawfully refused to grant Apotex final approval.  But for that unlawful Letter Ruling, Apotex would now have the final approval to which is statutorily entitled, and could begin marketing lower-priced generic gabapentin capsules to the American public immediately.

5.      FDA's unlawful Letter Ruling has caused, and continues to cause, Apotex and the American public irreparable harm for which Apotex is entitled to, *inter alia*, immediate declaratory and injunctive relief from this Court:

(a)     setting aside FDA's final Letter Ruling of February 6, 2004, as arbitrary, capricious, and contrary to law;

(b)     enjoining FDA from refusing to approve Apotex's ANDA No. 75-360 for gabapentin capsules based on any purported 180-day exclusivity;

(c)     directing FDA to finally approve Apotex's ANDA No. 75-360 for gabapentin capsules; and

(d)     staying FDA approval of Purepac's gabapentin ANDA Nos. 75-350 and 75-694 pending resolution of this action, or until FDA grants final approval of Apotex's ANDA No. 75-360 for gabapentin capsules, whichever is earlier.

Such relief is compelled by the plain language of the FDCA, as recently confirmed by Judge Roberts.

## Parties

6.     Plaintiff Apotex (a part of which was formerly known as TorPharm, Inc.) is a corporation organized and existing under the laws of Canada and having places of business at 150 Signet Drive, Weston, Ontario, Canada M9L 1T9, and 50 Steinway Boulevard, Etobicoke, Ontario, Canada M9W 6Y3.  Apotex develops and manufactures generic drugs, and in particular solid oral dosage forms such as capsules and tablets, for sale and use in the United States and throughout the world.

7.     Defendant Tommy G. Thompson is the Secretary of Health and Human Services and the official charged by law with administering the FDCA.  He is sued in his official capacity. Secretary Thompson maintains offices at 200 Independence Avenue, S.W., Washington, D.C. 20204.

8.     Defendant Lester M. Crawford is the Acting Commissioner and senior official of FDA.  He is sued in his official capacity.  Acting Commissioner Crawford has been delegated the authority to administer the drug approval provisions of the FDCA through FDA.  He maintains offices at 5600 Fishers Lane, Rockville, Maryland 20857.

**Jurisdiction And Venue**

9.      This action arises under the FDCA, 21 U.S.C. §§ 301 *et seq.*; the APA, 5 U.S.C. §§ 551 *et seq.*; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

10.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1361.

11.     This Court has personal jurisdiction over the defendants because they are either located and/or conduct substantial business in, or have regular and systematic contact with, this District.

12.     Venue is proper in this District under 28 U.S.C. § 1391(e).

13.     FDA has engaged in final agency action that presents an actual controversy, for which Apotex is entitled to review and relief under 5 U.S.C. §§ 702, 704-706.

14.     Apotex has standing to maintain this action, pursuant to the APA, as a legal entity that has suffered a legal wrong and has been adversely affected by final agency action.

15.     There exists an actual, substantial and continuing controversy between Apotex and FDA regarding FDA's refusal to grant final approval of Apotex's ANDA No. 75-360 for gabapentin capsules, a refusal that is arbitrary, capricious, and contrary to law, and for which Apotex requires immediate declaratory and injunctive relief against FDA.

16.     This Court may, under 28 U.S.C. §§ 2201, 2202, declare the rights and legal relations of the parties regarding FDA's arbitrary and capricious refusal to grant final approval to Apotex.

**Statutory And Regulatory Scheme For Approval Of New And Generic Drugs**

*New Drugs—NDAs and Patent Listing Requirements*

17.     Before marketing an innovator new drug (*i.e.*, not a generic drug) in the United States, the FDCA requires that an applicant submit, and that FDA approve, a new drug

application ("NDA") under 21 U.S.C. § 355(b).  The NDA must include, among other things, technical data on the composition of the drug, the means for manufacturing it, clinical trial results to establish the safety and efficacy of the drug, and labeling for the use of the drug for which approval is requested.

18.     An NDA applicant or holder must also submit information to FDA, including the patent number and expiration date, concerning all patents that claim the drug for which the applicant submitted the NDA, or that claim a method of using such drug, and with respect to which a claim for patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug.  21 U.S.C. § 355(b)(1).  The NDA-holder must also submit information to FDA regarding such patents that issue after NDA approval.  21 U.S.C. § 355(c)(2).

19.     Upon approval of the NDA drug, FDA publishes or lists patent information submitted by the NDA-holder in its publication, *Approved Drug Products with Therapeutic Equivalence Evaluations*, commonly known as the "Orange Book."

### Generic Drugs—ANDAs and Patent Certifications

20.     The FDCA provides an expedited ANDA approval process for regulatory approval of lower-priced generic versions of previously-approved NDA or brand-name drugs. The ANDA process is more streamlined than the full NDA procedure and results in a generic drug product that is normally marketed under the chemical name of the active drug ingredient.

21.     An applicant may invoke this procedure for expedited FDA approval of a generic version of an already-approved brand-name or NDA drug by submitting an ANDA to FDA under 21 U.S.C. § 355(j).

22.     Instead of repeating the comprehensive, extensive human clinical studies conducted for the previously-approved NDA drug, a generic ANDA applicant must simply

establish that its proposed generic product is bioequivalent to the already-approved NDA drug

(*i.e.*, has no significant difference in rate and extent of absorption) and that it has the same active

ingredient, dosage form, dosage strength, route of administration, and labeling (with certain

exceptions irrelevant here) as the approved NDA drug.  21 U.S.C. § 355(j)(2)(A).

23.     An ANDA applicant is also required to address each patent listed in the Orange

Book in connection with the approved NDA drug by submitting one of four types of patent

certifications for each listed patent:  (I) that the NDA-holder has not submitted any patent

information to FDA; (II) that the listed patent(s) has expired; (III) that the patent will expire on a

future date, and that the generic applicant will not market its product until after the expiration

date (commonly referred to as a "paragraph III certification"); or, (IV) that the listed patent is

invalid and/or will not be infringed by the manufacture, use, or sale of the generic drug for which

the ANDA is submitted (commonly referred to as a "paragraph IV certification").  21 U.S.C.

§ 355(j)(2)(A)(vii).

24.     A paragraph IV certification must be filed if the ANDA applicant is seeking

approval to market its proposed drug before expiration of any patent listed in FDA's Orange

Book in connection with the approved NDA drug.

25.     If an ANDA applicant submits a paragraph IV certification to FDA for any patent

listed in the Orange Book, the applicant is also required to notify the patent owner (and the

NDA-holder) of its intent to seek approval of its ANDA and to compete with the NDA-holder by

marketing the proposed generic equivalent of the NDA drug before expiration of the listed

patent.  This notice must include a detailed statement of the factual and legal basis for the ANDA

applicant's opinion that the listed patent is invalid and/or unenforceable and/or will not be

infringed by the manufacture, use, or sale of the proposed, equivalent ANDA drug.  21 U.S.C. § 355(j)(2)(B).

### Artificial Act of Infringement

26.     The submission of a paragraph IV certification for a listed patent constitutes an artificial act of infringement that creates the necessary subject-matter jurisdiction to enable an NDA-holder/patent owner to file, and a district court to resolve, an action for patent infringement—before the generic drug is actually made, used, or sold—to determine whether the generic drug, if and when marketed and sold in accordance with the ANDA, would infringe the relevant patent.

27.     Upon receipt of an ANDA applicant's notice of a paragraph IV certification, an NDA-holder/patent owner may file suit for alleged infringement of the patent under 35 U.S.C. § 271(e)(2)(A) within 45 days of receiving such notification.  Such a suit automatically delays FDA from issuing final approval of the ANDA for up to 30 months, or upon issuance of a final court decision that the ANDA drug does not infringe the relevant patent and/or that the patent is invalid, whichever is earlier.  21 U.S.C. § 355(j)(5)(B)(iii).

### 180-Day "One First Applicant" Exclusivity

28.     In order to encourage generic drug makers to incur the substantial risks and litigation costs associated with challenging an NDA-holder/patent owner's patents, and thereby expedite the market entry of lower-priced generic drugs, Congress mandated, within the FDCA, that the first applicant to file an ANDA with a paragraph IV certification is entitled to a 180-day period of generic marketing exclusivity during which it is the only ANDA applicant allowed to market a generic version of the NDA or brand-name drug.  This statutory benefit is commonly known as "180-day exclusivity."

29.     In particular, 21 U.S.C. § 355(j)(5)(B)(iv) provides that "[i]f the application contains a [paragraph IV] certification . . . and is for a drug for which a previous application has been submitted under this subsection [containing] such a certification, the application shall be made effective not earlier than one hundred and eighty days after" the earlier of:  (a) the first commercial marketing of that ANDA applicant's proposed drug; or, (b) any court decision holding that the patent that is the subject of the paragraph IV certification is invalid or not infringed.  These events, which commence the 180-day exclusivity period, are commonly referred to as "triggers."

30.     Under Title XI of the Medicare Prescription Drug, Importation and Modernization Act, which amended the FDCA, the triggering "court decision" holding that the patent is invalid or not infringed is a final decision from which no appeal has been or can be taken.  *See* Pub. L. No. 108-173, 117 Stat. 2066, 2460 (2003).  As interpreted by FDA and the courts, the FDCA also provides that the first generic applicant's 180-day exclusivity period can be triggered by a court decision in a case in which that applicant is not a party, and that the exclusivity period can begin to run and expire before the first applicant is even approved and on the market.

31.     FDA interprets every strength and dosage form of a particular generic drug as a separate drug product for which an applicant may potentially qualify for exclusivity.

32.     Section 355(j)(5)(B)(iv) yields *one* period of 180-day marketing exclusivity to the filer of a "previous application" with a paragraph IV certification, *i.e.*, to the first applicant to submit an ANDA with a paragraph IV certification to any listed patent (since that application would be a "previous application" to all others containing a paragraph IV certification to the same patent).  Section 355(j)(5)(B)(iv) accomplishes this by preventing FDA from approving an ANDA if that application contains a paragraph IV certification to a patent where a "previous

application" containing a paragraph IV certification to the same patent had already been submitted.

33.     Section 355(j)(5)(B)(iv) provides for only *one* period of 180-day exclusivity per drug product, and that exclusivity period goes to the first applicant to submit an ANDA with a paragraph IV certification to any listed patent for that drug product.  There can be *no* additional exclusivity periods for that drug product arising from paragraph IV certifications to other or subsequently-listed patents.  Stated otherwise, no other applicants will be eligible for exclusivity, and the first applicant is not eligible for an additional 180-day exclusivity period even if it is the first to submit a paragraph IV certification to a later-listed patent.

34.     For example, an NDA drug may have one or even several listed patents in the Orange Book.  If generic applicant "A" submits the first substantially complete ANDA with a paragraph IV certification to any of the listed patents, applicant A is entitled to the one and only period of 180-day exclusivity for that drug product that will be triggered by the earlier of first commercial marketing of the drug by applicant A or a final court decision on that patent by any applicant.  There are no additional periods of 180-day exclusivity available for this drug product for applicant A or any other applicants.  If applicant A's exclusivity has been triggered by a court decision and expired before applicant A begins to market its drug, neither applicant A nor any other generic applicant is entitled to an additional period of exclusivity for submitting a paragraph IV certification to another or subsequently-listed patent.  In other words, there is no more exclusivity for that drug product, and the market is open to all approved generic applicants.  FDA calls this interpretation of the statute the "one first applicant" approach.

35.     The plain language of the FDCA mandates and requires a "one first applicant" approach to 180-day exclusivity.  Nothing in the FDCA or its legislative history suggests that

Congress ever intended for there to be more than one 180-day exclusivity period for a particular

drug product, or that one applicant could qualify for multiple exclusivity periods for the same

drug product.

36.     For many years, FDA properly endorsed and applied the "one first applicant"

interpretation of the statute, as explained below, only to flip-flop—without basis—on several

occasions and eventually adopt the patent-based multiple-exclusivity interpretation challenged

here.

### 1984-1999:  FDA Properly Endorses and Applies the "One First Applicant" Approach to 180-Day Exclusivity

37.     From the inception of the Hatch-Waxman Amendments to the FDCA in 1984,

until at least August 2, 1999, FDA interpreted and applied the FDCA and its regulations to

provide one period of 180-day exclusivity per drug product solely to the first applicant to submit

an ANDA with a paragraph IV certification to any listed patent for that drug, *i.e.*, the "one first

applicant" approach.

38.     Once that single exclusivity period had been triggered and expired, FDA did not

award additional exclusivity periods based on paragraph IV certifications to other patents.  Even

if there were multiple-listed patents for a drug product for which applicants had submitted

paragraph IV certifications, only a single period of exclusivity was awarded to the first applicant

to submit an ANDA with a paragraph IV certification to any listed patent for that drug product.

Certifications to other or later-listed patents did not diminish that single period of exclusivity or

otherwise entitle the applicant to another period of exclusivity.

### August 2, 1999: Without Any Reasoned Basis, FDA Improperly Reverses Itself and Adopts the Patent-Based Multiple-Exclusivity Approach

39.    On August 2, 1999, however, in an informal letter regarding the drug cisplatin, issued without notice-and-comment or any other type of administrative rule-making, FDA suddenly switched focus, and adopted a "patent-based" multiple-exclusivity approach or interpretation, under which, FDA said, every listed patent for a particular drug product provides a separate opportunity for exclusivity.

40.    While acknowledging that "multiple periods of exclusivity could be difficult to administer," FDA nonetheless adopted this "patent-based" multiple-exclusivity approach without further explanation, other than to say that its own regulations "appear to be patent-based." This reversal was improper and unlawful under the statute and FDA's regulation, which regulation— as FDA would later recognize and acknowledge—is *not* patent-based, but rather focuses on the first applicant, just as the FDCA does.

### August 6, 1999: FDA Reverses Itself Again and Properly Goes Back to the "One First Applicant" Approach

41.    Several days later, on August 6, 1999, FDA reversed itself again and went back to the "one first applicant" approach, stating—in a proposed rule that *was* subject to notice-and-comment rulemaking—that *both* the current regulation *and* the proposed rule interpret the FDCA as allowing eligibility for exclusivity only for the applicant that submits the first substantially complete ANDA with a paragraph IV certification to any listed patent for a drug. In other words, FDA conceded that its own regulation interprets the statute to provide for "one first applicant" exclusivity. FDA rejected as unworkable any type of patent-based multiple-exclusivity approach arising out of multiple listed patents.

42.     In that proposed rule, FDA made it clear that there would only be one exclusivity period per drug product.  Once that exclusivity period was triggered and expired, no applicant, including the original first applicant, would be eligible for, or entitled to, an additional exclusivity period.

43.     This was FDA's only actual attempt at properly and formally creating a rule for 180-day exclusivity.  All of FDA's actions in creating and adopting a patent-based multiple-exclusivity approach were done, without any type of notice-and-comment, through informal letters that were not distributed industry-wide.

### November 16, 2001:  FDA Reverses Again and Adopts the Patent-Based Multiple-Exclusivity Approach

44.     On November 16, 2001, FDA reversed course yet again in an informal letter regarding the drug omeprazole, and re-adopted the patent-based multiple-exclusivity approach, under which every listed patent provides for another potential exclusivity period, and multiple periods of exclusivity can be "shared" among applicants.

45.     FDA conceded that this patent-based multiple-exclusivity approach is *not* found in the statute or legislative history, and that it has never been subject to notice-and-comment rulemaking.

46.     FDA then withdrew the proposed rule adopting the "one first applicant" approach, *not* because it is not faithful to and required by the FDCA, but only because FDA purportedly received some negative comments to it.

### Judge Roberts Rejects FDA's Patent-Based Multiple-Exclusivity Approach as Contrary to the FDCA and Adopts the "One First Applicant" Approach

47.     On January 2, 2004, in a case involving ANDAs for the antidepressant drug paroxetine hydrochloride (brand-name Paxil[®]), Judge Richard W. Roberts of the United States

District Court for the District of Columbia expressly rejected FDA's patent-based multiple-exclusivity interpretation of the FDCA as contrary to law, and instead held that the FDCA unambiguously required the "one first applicant" approach to exclusivity. *TorPharm, Inc. v. Food & Drug Administration*, No. 03 CV 02401, 2004 U.S. Dist. LEXIS 524 (D.D.C. Jan. 8, 2004) *appeal filed,* Nos. 04-5046 & 04-5047 (D.C. Cir. Feb. 6, 2004).

48.     In that case, TorPharm, Inc. (now known as Apotex) was the first applicant to submit an ANDA for a generic version of paroxetine with a paragraph IV certification to a listed patent.  Rather than award Apotex the sole and single 180-day exclusivity period to which it was entitled under the FDCA, FDA applied a patent-based multiple-exclusivity approach and awarded exclusivity periods to several other applicants based on paragraph IV certifications to other, subsequently-listed patents for paroxetine.  Apotex challenged FDA's decision as contrary to the plain language of the FDCA, which provides only one period of exclusivity per drug product, *i.e.*, the "one first applicant" approach.

49.     Judge Roberts agreed and struck down FDA's patent-based multiple-exclusivity interpretation of the statute and held that the FDCA must be interpreted to provide for one period of exclusivity that goes to the first applicant to submit a paragraph IV certification to a listed patent.  In his ruling from the bench, Judge Roberts stated that "[t]he plain language of the statute grants one first applicant exclusivity in marketing the new generic drug."  In his final Order memorializing that ruling, Judge Roberts held that FDA's patent-based multiple-exclusivity approach is contrary to the plain language of the FDCA.

50.     FDA has improperly refused to apply this proper interpretation of the FDCA to gabapentin ANDAs, but instead has appealed Judge Roberts's ruling and insists that it will continue to apply the unlawful patent-based multiple-exclusivity approach.

51.     On February 6, 2004, FDA moved to stay Judge Roberts's ruling on the ground that, among other things, FDA had a substantial likelihood of succeeding on appeal.  On February 26, 2004, Judge Roberts denied FDA's motion to stay, holding, among other things, that FDA had provided no new arguments on the merits that persuaded him of FDA's likelihood of success on appeal.

52.     On February 13, 2004, FDA filed a motion before the D.C. Circuit to expedite briefing and oral argument on appeal.  On March 4, 2004, the D.C. Circuit denied FDA's motion in its entirety, holding that FDA "failed to demonstrate . . . that the decision under review is subject to substantial challenge."

### Background Facts

### *Warner-Lambert's NDA No. 20-235 for Neurontin® (Gabapentin) Capsules*

53.     Pfizer Inc., by assignment from Warner-Lambert Company (collectively "Warner-Lambert"), holds approved NDA No. 20-235 for gabapentin capsules, which are sold under the brand-name Neurontin®.  FDA has approved gabapentin for, among other things, the treatment of epilepsy.

54.     Despite the expiration of the pioneer patents for gabapentin and its approved use, Warner-Lambert is still the only company selling gabapentin in the United States.  Warner-Lambert's gabapentin monopoly currently earns well over $2.4 billion per year in U.S. sales alone—or over $6 million per day.  Generic versions of gabapentin could save U.S. consumers hundreds of millions of dollars per year in prescription drug costs.

### *Listed Patents for Gabapentin*

55.     As initially submitted, Warner-Lambert's NDA No. 20-235 for Neurontin® (gabapentin) capsules contained information on three patents, of which only one is relevant here:

U.S. Patent No. 4,894,476 ("the '476 patent"), which will expire in 2008, and claims an unapproved crystalline form of gabapentin known as gabapentin monohydrate.

56.     Upon approval of Warner-Lambert's NDA No. 20-235, FDA listed the '476 patent, and others, in the Orange Book in connection with Neurontin® capsules.

### *Purepac Purportedly Submits the First*
### *ANDA for Gabapentin Capsules*

57.     On March 30, 1998, Purepac submitted ANDA No. 75-350 for generic gabapentin capsules.  With its ANDA, Purepac submitted a paragraph IV certification to the '476 patent, stating that its generic gabapentin product will not infringe the '476 patent.

58.     Purepac was purportedly the first applicant to submit an ANDA for gabapentin capsules containing a paragraph IV certification to a listed patent, here the '476 patent.

59.     Under FDA's proper "one first applicant" interpretation of the FDCA at that time (as later confirmed by Judge Roberts), Purepac was entitled to a *single* (or one and only one) period of 180-day exclusivity for gabapentin capsules arising out of its first ANDA and paragraph IV certification to the '476 patent.  This should have been the one and only period of 180-day exclusivity for gabapentin capsules.  Once that period was triggered and expired, there could be no additional exclusivity periods for gabapentin capsules either for Purepac or any other applicant.

60.     In response to Purepac's ANDA and paragraph IV certification to the '476 patent, Warner-Lambert sued Purepac for alleged infringement of the '476 patent in the United States District Court for the District of New Jersey (Lifland, J.).

### *Apotex Submits Its Own ANDA for Gabapentin Capsules*

61.     On or about April 17, 1998, Apotex (a part of which was formerly known as TorPharm, Inc.) submitted ANDA No. 75-360 for generic gabapentin capsules.  With its ANDA, Apotex also included a paragraph IV certification to the '476 patent.

62.     In response, on July 14, 1998, Warner-Lambert sued Apotex for alleged infringement of, among other things, the '476 patent in the United States District Court for the Northern District of Illinois, Eastern Division (Plunkett, J.).

63.     FDA has tentatively approved Apotex's ANDA No. 75-360 for generic gabapentin capsules.  Tentative approval means that Apotex has satisfied all substantive requirements for final approval, but that final approval is supposedly being delayed by a purported 180-day exclusivity period.

### *Apotex Prevails on the '476 Patent and Triggers Purepac's 180-Day Exclusivity—Which Has Now Expired*

64.     On March 2, 2001, the Illinois district court (Plunkett, J.) granted summary judgment of noninfringement for Apotex on the '476 patent.  This court decision of noninfringement on the '476 patent became final and appealable on September 14, 2001, when the court disposed of the remainder of the case by granting summary judgment for Apotex on the remaining patent and claims as well.

65.     Warner-Lambert did *not* appeal Apotex's favorable court decision on the '476 patent, and can no longer do so since the time for appeal expired in October 2001.  This judgment became a final triggering court decision, from which no appeal can be or has been taken, in October 2001.  This court decision triggered Purepac's 180-day exclusivity on the '476 patent—the only exclusivity for gabapentin capsules—as of October 2001.  That exclusivity period expired no later than April 2002.

66.     FDA concedes that "[e]xclusivity as to the '476 patent was triggered with the unappealed district court decision and has expired."

67.     Nevertheless, as explained below, FDA still refuses to approve Apotex's ANDA, and other applicants' gabapentin ANDAs, even though Purepac's exclusivity has long since expired.  Because this exclusivity period has now expired, there can, under the FDCA (as recently confirmed by Judge Roberts), be no further gabapentin exclusivity, and the market should now be open to all approvable gabapentin ANDA applicants, including Apotex.

*Warner-Lambert Obtains and Lists the '482*
*Patent; Sues Purepac, Apotex, and Others*

68.     While the patent litigation on the '476 patent was still pending against Purepac and Apotex, Warner-Lambert obtained and listed yet another gabapentin patent in the Orange Book:  U.S. Patent No. 6,054,482 ("the '482 patent"), which claims a pharmaceutical composition containing gabapentin.

69.     All gabapentin applicants, including Purepac and Apotex, amended their ANDAs to include paragraph IV certifications to the '482 patent stating that the '482 patent will not be infringed by their generic gabapentin drug products, and also sent the requisite notices to Warner-Lambert.  Purepac was purportedly the first applicant to submit a paragraph IV certification to the '482 patent.

70.     In response, Warner-Lambert sued Purepac, Apotex, and other gabapentin applicants in separate suits for alleged infringement of the '482 patent, which are now consolidated in the United States District Court for the District of New Jersey (Lifland, J.). These infringement actions on the '482 patent are still pending, and no court decisions have been rendered.

*Contrary to the Plain Language of the FDCA, FDA Applies*
*a Patent-Based Multiple-Exclusivity Approach to Gabapentin ANDAs*

71.     Notwithstanding Judge Roberts's ruling, or the fact that any exclusivity on the '476 patent (which should have been the *only* gabapentin exclusivity) has been triggered and expired, FDA has applied, and continues to apply, a patent-based multiple-exclusivity approach, and *not* a "one first applicant" approach, to gabapentin ANDAs.

72.     In particular, notwithstanding Purepac's expired exclusivity on the '476 patent (which should have been the only exclusivity for gabapentin), FDA has taken the position that Purepac is entitled to a second period of 180-day exclusivity, this one for the '482 patent. According to FDA, final approval of all other gabapentin capsule ANDAs, including Apotex's ANDA No. 75-360, must await the expiration of Purepac's exclusivity on the '482 patent.

73.     FDA's decision has indefinitely delayed generic gabapentin competition, and the introduction of more affordable prescription drugs, because, to date, Purepac has "parked" its purported exclusivity and chosen not to market its product.  As such, the entire generic market is blocked, and no generic gabapentin products are available, which benefits only Warner-Lambert by further extending its gabapentin monopoly.

74.     On information and belief, however, Purepac may attempt to launch its gabapentin product before this action is adjudicated, in an attempt to moot this action and secure *de facto* gabapentin exclusivity to which Purepac is not statutorily entitled.

75.     Under a proper interpretation of the FDCA, Purepac is not entitled to a second period of gabapentin exclusivity, and so has no right to launch its gabapentin product alone in order to obtain a statutory benefit to which it is not entitled.  At most, Purepac may launch its gabapentin product with Apotex and other approvable gabapentin applicants.

76.     Apotex now seeks to open the generic gabapentin market for all approvable applicants and American consumers as required by the FDCA, as recently confirmed by Judge Roberts on January 2, 2004, when he held that FDA's patent-based multiple-exclusivity approach is contrary to the plain language of the FDCA and that the FDCA provides for only one period of exclusivity to the first ANDA applicant to file a paragraph IV certification to a listed patent.

**Apotex Exhausts Its Administrative Remedies**

77.     As noted above, Apotex has satisfied all substantive requirements for final approval of its gabapentin capsule ANDA.

78.     On January 15, 2004, Apotex appropriately exhausted its administrative remedies by promptly writing FDA and requesting final approval of its gabapentin capsule ANDA No. 75-360 for gabapentin capsules on the ground that, under the FDCA (as recently confirmed by Judge Roberts), there can no longer be any exclusivity period for gabapentin capsules that would delay final approval of Apotex's ANDA.  As such, Apotex is entitled to immediate final approval.

**FDA's Final Letter Ruling Of February 6, 2004,
Is Arbitrary, Capricious, And Contrary To Law**

79.     On February 6, 2004, FDA issued a final Letter Ruling denying Apotex's request for final approval, stating that the Agency will continue to apply a patent-based multiple-exclusivity approach to gabapentin ANDAs under which Purepac is purportedly entitled to a second period of exclusivity for gabapentin arising out of the subsequently-listed '482 patent.

80.     FDA's final Letter Ruling is arbitrary, capricious, and contrary to the plain language of the FDCA, which requires a "one first applicant" approach to 180-day exclusivity.

81.     Under the plain language of the FDCA (as recently confirmed by Judge Roberts), there is *one, and only one,* period of 180-day exclusivity per drug product, and that exclusivity period goes to the first applicant to submit an ANDA with a paragraph IV certification to any listed patent.  There can be *no* additional exclusivity periods for that drug product arising from paragraph IV certifications to other or subsequently-listed patents.  Stated otherwise, no other applicants will be eligible for exclusivity, and the first applicant is not eligible for an additional 180-day exclusivity period even if it is the first to submit a paragraph IV certification to a later-listed patent.

82.     Purepac is not entitled to 180-day exclusivity for gabapentin as to the '482 patent where, as here, the one and only exclusivity period for gabapentin has already been triggered and expired.

83.     FDA's patent-based multiple-exclusivity approach was adopted by FDA without notice-and-comment in direct contravention of the FDCA.  Congress did not intend for there to be multiple exclusivities based on multiple listed patents.

84.     Under the only proper interpretation of the FDCA, as interpreted previously by FDA and recently confirmed by Judge Roberts, the one-first-applicant approach to 180-day exclusivity must be applied to gabapentin ANDAs.  Under that approach, the only possible exclusivity period for gabapentin capsules arose out of Purepac's first ANDA with a paragraph IV certification to the '476 patent.  As FDA concedes, that exclusivity period was triggered and expired years ago.  As such, there are no additional exclusivity periods for gabapentin capsules, and FDA has no basis to withhold final approval of Apotex's ANDA No. 75-360 for gabapentin capsules or any other gabapentin ANDAs that are otherwise eligible for final approval.

**Request For Administrative Stay**

85.     On April 12, 2004, Apotex requested that FDA administratively stay approval of Purepac's gabapentin ANDAs pending resolution of this suit, on the ground that Purepac is not entitled to such approval alone or the considerable benefits that accompany exclusive approval. Rather, all approvable applicants are entitled to such approval along with Purepac.  Absent such a stay, Purepac could launch its gabapentin products and effectively secure a valuable *de facto* exclusivity period to which it is not entitled.  The considerable harm to other gabapentin applicants, like Apotex, would be irreparable.

86.     FDA has, to date, not administratively stayed approval of Purepac's gabapentin ANDAs pending resolution of this suit.

**Apotex Is Entitled To Immediate Injunctive Relief**

87.     Apotex has satisfied all substantive requirements for final FDA approval of its gabapentin capsule ANDA No. 75-360, including, but not limited to, the required showing that Apotex's gabapentin capsule product is bioequivalent to Warner-Lambert's Neurontin[®] capsules. All 30-month stays applicable to Apotex's gabapentin capsule ANDA No. 75-360 have expired.

88.     FDA's Letter Ruling has indefinitely delayed the market entry of generic gabapentin.  To date, Purepac has refused to launch its own generic gabapentin product.  In the interim, the American public is denied access to more affordable gabapentin products.

89.     On information and belief, however, Purepac may now launch its product in an attempt to moot the effects of an adverse ruling from this Court, thus providing Purepac with a *de facto* exclusivity period to which it is not statutorily entitled.

90.     But for FDA's unlawful Letter Ruling, Apotex would qualify for final approval now and could begin marketing generic gabapentin and immediately provide American

consumers with a lower-priced, safe, and effective generic version of Warner-Lambert's Neurontin® capsules.

91.     As a direct and proximate result of FDA's unlawful Letter Ruling, Apotex is now suffering and incurring, and will continue to suffer and incur, irreparable harm and substantial damages, for which Apotex is entitled to immediate declaratory and injunctive relief.  Such relief will further the American public's considerable interest in having greater access to affordable generic drugs.

92.     Apotex is further entitled to emergency interim injunctive relief staying FDA approval of Purepac's ANDA Nos. 75-350 and 75-694 pending the resolution of this suit.

### First Claim For Relief
### (Violation of the FDCA and APA)

93.     Apotex repeats and realleges paragraphs 1 through 92 inclusive hereinabove, as though fully alleged herein.

94.     FDA's February 6, 2004 Letter Ruling refusing to grant Apotex final approval is arbitrary, capricious, and not in accordance with the law within the meaning of 5 U.S.C. § 706(2)(A), in excess of statutory authority within the meaning of 5 U.S.C. § 706(2)(C), and in violation of the FDCA.

95.     FDA's February 6, 2004 Letter Ruling constitutes final agency action that is reviewable by this Honorable Court.

96.     FDA's February 6, 2004 Letter Ruling will continue to irreparably damage and harm Apotex and the consuming public unless and until this Court issues immediate declaratory and injunctive relief setting aside FDA's Letter Ruling and compelling FDA to finally approve Apotex's ANDA No. 75-360 for gabapentin capsules.

97.     Apotex has exhausted its administrative remedies.

98.     Apotex has no adequate remedy at law.

WHEREFORE, Apotex respectfully prays that this Honorable Court enter judgment in its

favor and against Defendants, as follows:

(a)     Issuance of a declaratory judgment setting aside, as arbitrary, capricious, and
contrary to law, FDA's February 6, 2004 Letter Ruling refusing to finally approve
Apotex's ANDA No. 75-360 for gabapentin capsules;

(b)     Issuance of a declaratory judgment that there are no unexpired 180-day
exclusivity periods delaying final approval of Apotex's ANDA No. 75-360 for
gabapentin capsules, and any other gabapentin ANDAs that are otherwise eligible
for final approval;

(c)     Issuance of an injunction enjoining FDA from refusing to finally approve
Apotex's ANDA No. 75-360 for gabapentin capsules, and any other gabapentin
ANDAs that are otherwise eligible for final approval, based on any purported
180-day exclusivity under 21 U.S.C. § 355(j)(5)(B)(iv);

(d)     Issuance of an injunction directing FDA to finally approve Apotex's ANDA No.
75-360 for gabapentin capsules, and any other gabapentin ANDAs that are
otherwise eligible for final approval;

(e)     Entry of an order awarding Apotex its reasonable attorneys' fees and costs of
prosecuting this action; and,

(f)     Such other and further relief as the Honorable Court deems just and proper.

## Second Claim For Relief
### (Stay/Interim Injunctive Relief)

99.     Apotex repeats and realleges paragraphs 1 through 98 inclusive hereinabove, as

though fully alleged herein.

100.    As alleged in greater detail above, Purepac is not entitled to a second period of

180-day exclusivity for gabapentin arising out of the '482 patent.  Any exclusivity for gabapentin

that Purepac may have had, if at all, was triggered and expired long ago.  As such, the gabapentin

market should now be open, and final approval must be issued to Apotex and any other

gabapentin applicants that are otherwise eligible for final approval.  FDA should not be allowed

to approve Purepac's gabapentin ANDAs without also approving Apotex's ANDA No. 75-360

for gabapentin capsules, and any other gabapentin ANDAs that are otherwise eligible for final approval.

101.     FDA's approval of Purepac's gabapentin ANDA with purported exclusivity on the '482 patent, together with FDA's Letter Ruling refusing to approve Apotex's ANDA No. 75-360 for gabapentin capsules, is arbitrary, capricious, and not in accordance with the law within the meaning of 5 U.S.C. § 706(2)(A), in excess of statutory authority within the meaning of 5 U.S.C. § 706(2)(C), and in violation of the FDCA.

102.     If Purepac's final approval is not stayed and Purepac launches its gabapentin products before this action is resolved, Purepac would effectively and unlawfully benefit from a *de facto* gabapentin exclusivity to which it is not statutorily entitled.  Such a head-start by Purepac would irreparably harm Apotex and other gabapentin applicants, who are also entitled to final approval.

103.     FDA's refusal to administratively stay Purepac's ANDAs pending resolution of this suit constitutes final agency action that is reviewable by this Honorable Court.

104.     FDA's February 6, 2004 Letter Ruling will continue to irreparably damage and harm Apotex and the consuming public unless and until this Court issues immediate injunctive relief temporarily staying FDA approval of Purepac's ANDA Nos. 75-350 and 75-694 until the resolution of this action, or until FDA grants immediate final approval of Apotex's ANDA No. 75-360 for gabapentin capsules, whichever is earlier.

105.     This Court has authority to grant such relief under 5 U.S.C. § 705.

106.     Apotex has exhausted its administrative remedies.

107.     Apotex has no adequate remedy at law.

WHEREFORE, Apotex respectfully prays that this Honorable Court enter the following interim relief:

(a)    Issuance of an interim injunction enjoining and staying FDA approval of Purepac's gabapentin ANDA Nos. 75-350 and 75-694 pending resolution of this suit, or until FDA grants final approval of Apotex's ANDA No. 75-360 for gabapentin capsules, whichever is earlier.

(b)    Entry of an order awarding Apotex its reasonable attorneys' fees and costs of prosecuting this action; and,

(c)    Such other and further relief as the Honorable Court deems just and proper.

Dated:  April 14, 2004.

Respectfully submitted,

APOTEX INC.

By: _____
Arthur Y. Tsien, D.C. Bar No. 411579
Patricia E. Pahl, D.C. Bar No. 427347
OLSSON, FRANK AND WEEDA, P.C.
1400 16th Street, N.W., Suite 400
Washington, D.C. 20036-2220
(202) 789-1212
(202) 234-3550 (facsimile)

Of Counsel:
William A. Rakoczy
Deanne M. Mazzochi
Matthew O. Brady
Amy D. Brody
Lara E. Monroe-Sampson
RAKOCZY MOLINO MAZZOCHI LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
(312) 222-6301
(312) 222-6321 (facsimile)
wrakoczy@rmmlegal.com

*Counsel for Apotex Inc.*